Filed 8/20/14  P. v. Renteria CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B247272 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA350350) |
| v. | |
| JOSE RENTERIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Shawn McGahey Webb and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Jose Renteria guilty of attempted premeditated murder, with findings that he personally used and discharged a firearm, and that the offense was committed for the benefit of a criminal street gang. (Pen. Code, §§ 664, 187, subd. (a), 12022.53, subds. (b), (c), (d), 186.22, subd. (b).)[1] Further, the jury found Renteria guilty of first degree murder, with a special circumstance gang finding, and a finding that a principal used and discharged a firearm causing death. (§§ 187, subs. (a), 190.2, subd. (a)(22), 12022.53, subds. (b), (c), (d), (e)(1).) The trial court sentenced Renteria to a term of life in prison without the possibility of parole as to the first degree murder, plus 25 years to life for the firearm enhancement. The court sentenced Renteria to a consecutive term of life with the possibility of parole as to the attempted premeditated murder, with a minimum term of 15 years for the gang enhancement, plus 25 years to life for the firearm enhancement. We affirm.

## FACTS

I.    **The Crimes**

      **Count 3 — The Attempted Premeditated Murder**

      Renteria was a member of the Avenues gang. His gang moniker was "Snapper." On May 15, 2007, a SUV drove up alongside Luis Piche as he was walking on the sidewalk on York Avenue, in an area within the territory claimed by the Highland Park gang. Renteria "hit up" Piche, that is, he asked "where he was from." Piche said he was from "Highland Park" and added, "Fuck Noodles," a derogatory term for the Avenues gang. At that point, Renteria leaned out of the SUV with a "big" or "long" gun, later recovered and determined to be a AKA semiautomatic rifle, and "just started shooting." Renteria fired upwards of 20 times. Police recovered 13 shell casings at the scene. Piche was hit by 14 bullets. He survived, but was hospitalized for two months. He used a wheelchair for more than a year, and then needed leg braces, walkers and canes to walk. The Piche shooting remained an open investigation for some time after it occurred.[2]

---

[1]    All further section references are to the Penal Code except as otherwise noted.

[2]    In late October 2007, officers with the Los Angeles Police Department's (LAPD) "Criminal Apprehension Team" conducted a search of the home of Jorge "Oso" Lara, a

2

On appeal, Renteria does not dispute that substantial evidence presented at trial supports the jury's finding that he was the shooter. Additional facts will be discussed a necessary to address Renteria's claims of error on appeal.

**Count 1 — The Premeditated Murder**

On August 2, 2008, a little more than one year after the Piche shooting, Carlos "Stoney" Velasquez, a member of the Avenues gang, got out of a vehicle and walked up to Juan Escalante (who happened to be a deputy sheriff) as he was standing next to his truck in front of his home, getting ready to leave for work. Velasquez asked Escalante where he was from and started shooting Escalante with a semi-automatic handgun. Six .40-caliber shell casings were recovered from the scene. The firing pin impressions on six shell casings showed that all had been fired from a single weapon, and were typical of firearms manufactured by the Glock gun manufacturing company.

Escalante died from multiple gunshot wounds. One bullet entered his head and lodged in his brain. A second bullet grazed an ear, entered the right side of the head, fractured the skull, and exited through the scalp. A third bullet entered the right cheek, fractured the jawbone and lodged under the scalp at the bottom of the skull. A fourth bullet hit the right shoulder and lodged near the shoulder blade. Escalante had abrasions on the top his head, above the left eye, on the left chin, and between the eye and ear. Escalante's injuries were consistent with him standing and facing the shooter, being shot in the right cheek, falling forward and then being shot three more times while falling face-forward onto the ground.

Later on the morning of the Escalante shooting, Velasquez told his girlfriend, Vanessa Arellano, that he had shot someone from Cypress Park. About two days later, Velasquez told Arellano that he heard on the news that the person who he had shot was a deputy sheriff.

---

member of the Avenues gang. During the search, officers recovered a loaded AKA semi-automatic rifle in a bedroom. In March 2009, a prosecutor requested that the AKA rifle be tested. In June 2009, a ballistic examination showed that it was the rifle that fired the 13 shell casings recovered at the scene of the Piche shooting.

On appeal, Renteria does not dispute that substantial evidence supports the jury's finding that he gave the firearm used in the Escalante murder to Velasquez to use for the planned purpose of committing a shooting of any rival gang member that could be found. Additional facts will be discussed a necessary to address Renteria's claims of error on appeal.

II.     **The Investigation in the Aftermath of Deputy Escalante's Murder; Related Investigations; Significant Witnesses and Recorded Statements**

   A.     **Recorded Phone Calls and Conversations — the Escalante murder**

   In September 2008, LAPD Detective Laura Evens was assigned as one of the primary investigators of Deputy Escalante's murder. In the course of her investigation, Detective Evens listened to a number of taped telephone conversations between members of the Avenues gang, to and from jailhouse phones, at about the time of Deputy Escalante's murder. Detective Evens also listened to a number of taped telephone phone conversations obtained from wire-taps authorized by court orders in a federal investigation of the Avenues gang that happened to be ongoing at the time of Deputy Escalante's murder.[3] The recorded conversations included the following:

   On June 17, 2008, about one and one-half months before Deputy Escalante's murder, a jail telephone call was recorded between Renteria and his brother, Carlos "Rider" Renteria. During that conversation, Renteria stated that he had a "Mickeys," and that it was a "40-ounce" and that it was a "G." At trial, David Holmes, a detective supervisor for the Los Angeles Police Department (LAPD), testified that gang members often refer to a .40-caliber gun as a "Mickey."

   On August 6, 2008, four days after Deputy Escalante's murder, jail authorities recorded a telephone call between Renteria and Alex "Gunner" Valencia, a member of the Avenues gang who was in custody. During that conversation, Renteria asked Valencia, "Did you hear about what happened?" and Valencia responded, "Don't say nothing, fool, don't say nothing. Shut up." Renteria also said his mother had gone to see

---

[3]     Below we discuss evidence from Francisco "Pancho" Real, an Avenues gang member arrested in the course of the federal investigation.

4

"Carlos," and that she had said "they punished him because of what happened." Valencia then said, "[H]ey fool, don't even talk about that, fool. Don't even talk about that better. . . . Nothing, nothing, nothing, nothing. Hey fool, but nothing, just chillin, fool . . . ."

On November 29, 2008, about three months after Deputy Escalante's murder, authorities recorded a telephone conversation between Renteria, Arnulfo "Sneaky" Sillas, and Gregory "Lokito" Mondragon. During this conversation, Sillas said he was "kicking it" with "Locs" in Sillas's pad. After chit-chat about "mobbing" Drew Street, Renteria asked to talk to "Lokito." When Mondragon got on the line, Renteria asked, "You fools got a 'Baby?" Mondragon replied, "Nah, we got that shit." Renteria then asked, What, the, the 'Mickey?" Mondragon said, "Not that one." Renteria then asked, "Which one?" At that point, Mondragon said, "Fool, I don't even want to talk about that shit on the phone." Later, Renteria complained to Sillas about "lame ass homies that just want to be in the picture . . . . That's what, that what I've been thinking about in here dawg. Like fools claiming the hood and don't even post up, you know what I mean." Sillas said that he had told "Locs" earlier, "We are the only ones on Drew, fool. Nobody wants to go no more. Renteria told Sillas to "do it like I did, fool. I be the only one on Drew. I don't give a fuck, dawg."

On December 4, 2008, authorities recorded a telephone conversation between Renteria, Carlos "Stoney" Velasquez and Anthony "Kid" Rodriguez." During this conversation, Renteria told Velasquez that "two pigs" had come to see him, and were asking him "bullshit questions" and telling him "crazy shit." Renteria speculated that the police had talked to "Ducky" and "Sneaky." Renteria complained that Sneaky "be doing that shit, talking to people and shit." Velasquez wanted to know if the police had also gone to his house, too.

On December 12, 2008, police arrested Velasquez. Shortly after he was arrested, Velasquez gave a videotaped interview in which he admitted shooting Deputy Escalante.

On December 17, 2008, Renteria talked to Arnulfo "Sneaky" Sillas in a police interview room for about an hour. That conversation was videotaped, and is the subject of a claim by Renteria on appeal that the conversation should have been suppressed.

5

During this conversation, Renteria said that the police had asked him to call Sillas and ask him what he did with the gun. Renteria, added, "That shit's gone, man." Sillas said, "I don't know what happened to it fool." Renteria replied, "Me neither, that's why, that's why I told you to get rid of it . . . ." Sillas remarked that Carlos Velasquez ("Stoney") had "admitted to it," but did not take the rest of them "down with him."

Later, Renteria and Sillas discussed the gun again. Sillas said he did not know what happened with it. Renteria replied, "Yeah, that's why I told you, just get rid of that shit, fool." Sillas responded, "I didn't even do anything with it dick." Sillas added, "I didn't want to touch that shit fool. I never touched that shit after you showed it to me that day." Sillas later repeated, "I don't know what happened to it dick. I never touched it fool, fuck that shit, that shit was to [*sic*] big to touch homie." Sillas added, "That's why I didn't have anything to do with it. Why the fuck would I fuck with it. Only because it was your strap dick." Renteria replied that when he "buried it" and "just left it there," he did not know who got it. Renteria said he did not see "no one get it." Sillas agreed that he "never got it," "did nothing about it," and "never saw who got it." Renteria asserted that the police were saying that he was bragging about it. However, Renteria denied saying anything. Sillas said that the police had "Mickey." Renteria said that the police asked him, "'Do you happen to know a gun like this?'" Renteria admitted he had seen one and said, "'Baby.'" The police then "took out the .40," and Renteria said he needed an attorney. Sillas continued to assert he did not know who had the weapon. Renteria stated, "I don't know who had it last. I just know it was somewhere out there . . . ." Sillas replied, "Remember you use to call me to get rid of it? I never got rid of it fool." Renteria said, "But I know, I know it's not at my pad anymore. That shit's, that shit's gone." Sillas said, "The last time, remember the last time you told me, 'I'm going to stash it.' And then you got busted." Sillas added that he "never got it again" and "wasn't trying to fuck with that shit." Renteria agreed that the "shit just disappeared." Sillas told Renteria that "the homie 'P' snitched." Renteria asked, "'P'?" Sillas clarified, "Yeah, 'Pancho.' I heard he took all of them down fool." Renteria stated, "Fool from day one

6

fool 'P,' to me he was never." Renteria said Pancho was "firme [cool] but was "never the main head."

After discussing other matters, Sillas and Renteria again returned to a discussion regarding the "strap." Sillas asserted that he did know where it was located and that Carlos Velasquez ("Stoney") had "already admitted to it." Sillas said that he had never touched the weapon after Renteria got "locked up." Renteria stated, the weapon "got away from my pad. I don't even know where it was last put."

Sillas again said that he did not know "what happened to the shit, the 'Mickey.'" Renteria said that "what's his name got busted" with the .25-caliber weapon. However, neither Sillas, nor Renteria, knew what happened to the "Mickey." Renteria said, 'I'm thinking they, they probably got it fool." Sillas advised Renteria to tell the police where he "stashed it" because if the police did not find it there, "somebody else must have get it." Renteria said he hid it between two cushions. Renteria said someone "took it out 'cause it wasn't in my house no more."

Sillas stated that the "hood" was "gone." Renteria agreed, saying, "Yeah, it's over, it's over--." Renteria added that "Fuckin' 'P' dawg" was a "fuckin' cheese." Renteria promised, "Fuck, si lo miro en la county [if I see him in county], I'll probably be able to [makes motion to his own chest]." Renteria and Sillas then returned to a discussion regarding the "Mickeys." Renteria stated, "From what I think fool, that shit, I know that shit's long gone fool. 'Cause the way, the way I was bragging about it fool. It was a mandatory for someone to get rid of it fool. Because I didn't want to, you know? I didn't want to be the one to get caught up with it."

Renteria said, "I've seen a picture of it. . . . I don't know if it was it or it was just, you know, another .40 Glock . . . ." Renteria then asked for an attorney because "because that right there is too deep, you know that's too much into evidence you know."

Renteria noted that whatever he said to the police would be used against him. As a result, he was trying to pick his words carefully. Renteria said the police thought that Stoney was the one who loaded the gun. Renteria told Sillas, "But remember how I put the bullets, a hollow point y luego [and then] a flat top, hollow point, flat top." Renteria

7

said he was the "one who personally did that." Renteria loaded the gun that way because it was his and he was looking out for his own protection in case he got "caught slipping with someone in a car or on foot."

Renteria said he would have known if he was shooting an officer.

Once again, the conversation returned to the gun. Sillas said the last he heard about it was that Lokito had said that Bosco "got rid of it." Renteria replied, "So that shit must be. If they don't got it, if they don't got it, that shit must be, it has to be long gone fool."

Renteria reiterated that he had been shown a picture of a Glock; he did not know if it was a .40 or a nine millimeter. Renteria said "the 'Baby' looked like the 'Baby.'" Renteria described it as a "[b]ig ass 'Baby," that was 'chromed out, with the brown little thing." Sillas said that Renteria had not given the weapon to Stoney then Stoney would not have used it. Renteria agreed, "I should of never give it to him, 'cause they – that night. Remember how I was stingy with that shit?" However, that night, he was angry because "the 'Highland Parks' had went by." Renteria said he told Stoney, " 'If anything, 'Park,' any 'Park," you know, 'Cypress Park' or, or, or 'Highland Park' fool, you know?' " Renteria said he did not want to give the gun to Stoney, but did not want to give him the .25 caliber weapon either because it would jam.

At a meeting in January 2008, the members of the Avenues gang "officially" decided that Real would be in charge of "collecting and making the shots" in the "Drew Side clique" of the gang.

On February 21, 2008, Clever (Real's brother) and other members of the Avenues gang shot Marco Salas multiple times with an AK-47, a .380 handgun, and a 9 millimeter handgun. On the way back from the shooing, Clever and a fellow gang member got into a shoot-out with police, and Clever was killed.

In June 2008, Real was arrested. He was indicted in federal court, along with 66 other members of the Avenues gang. In July 2008, Real met with officials from the Drug Enforcement Agency and the U.S. Attorney. In November 2008, Real pled guilty in federal court to racketeering and distribution of crack cocaine. As part of his plea

arrangement, Real agreed to cooperate with law enforcement officials and to provide truthful information about the gang's activities. At some point, Real provided information about the Piche shooting. At Renteria's trial, Real testified that he was in one of two vehicles that Avenues gang members drove to the scene of the shooting, and that he saw Renteria shoot Piche.

### B.    Arnoldo Pineda — the Escalante Murder

Arnoldo Pineda had been forced at gunpoint to drive Carlos "Stoney" Velasquez and other members of the Avenues gang to the scene of the shooting of Deputy Escalante. In December 2009, police arrested Pineda at his home. In March 2010, Pineda agreed to retrace the route taken by the assailants to the scene of the shooting of Deputy Escalante. The retraced drive was videotaped, and the photographs from the videotape were shown at trial during Pineda's testimony.

### C.    Andy Castillo — the Piche Attempted Murder

On February 25, 2010, Detectives Howard Jackson and Carlos Camacho interviewed Andy Castillo and secretly recorded the interview. During the interview, the detectives played a recorded telephone call between Castillo and Renteria's brother, Carlos Renteria, in which Carlos Renteria asked Castillo where he left the "piece." Castillo stated that he remembered being in a red or gray car with "Pancho" when someone was shot. Castillo said that he was picked up on the corner of Drew and Estara and Pancho was in the car. There was another car with three gang members in front of them. The two cars drove up the street; someone saw "some kid, some guy and they shot him." Although Castillo did not see the shooter, he believed "Snapper" did the shooting because Snapper was the one who had the weapon. The car that Castillo was in was three cars behind the car that contained the shooter. Pancho told Castillo to "tell no one" about the shooting. The detectives showed Castillo a photographic lineup. Castillo identified Renteria as Snapper.

Castillo's out-of-court statements implicating Renteria were admitted at trial as inconsistent prior statements in the following context. At trial, as the prosecutor began to ask him questions, Castillo said, "Fuck this," and got up to leave the courtroom. After he

9

sat back down, Castillo testified that he did not remember or did not know anything about the Piche shooting.

## III.    The Criminal Case

In June 2010, the People filed an information charging Renteria with the attempted premeditated murder of Piche (count 3), and the premeditated murder of Escalante (count 1). The information also charged Arnoldo Pineda with the premeditated murder of victim Escalante.

In September 2010, Pineda pled no contest to voluntary manslaughter with a gang allegation, and the murder count was dismissed. As part of his plea arrangement, Pineda agreed to testify truthfully for the prosecution. In October 2010, the People filed an amended information charging Renteria with the attempted premeditated murder of Piche (count 3), and the premeditated murder of Escalante (count 1).[4]

The charges against Renteria were tried to a jury in February 2013. The evidence against Renteria as to count 3, the attempted murder of victim Piche, included eyewitness testimony from Francisco "Pancho" Real (whose involvement with the Avenues gang is summarized above, and who drove in a following car to the scene of the shooting) and from Janice Ricardo, a civilian witness who happened to witness the shooting from her car. Further, the prosecution introduced the out-of-court statement of Andy Castillo as summarized above. The evidence against Renteria as to count 1, the premeditated murder of victim Escalante consisted of testimony which showed the general framework of the shooting, and evidence of the various recorded conversations between Renteria and others taken over a course of time during the investigation of the Deputy Escalante's murder, as we summarized above. These recordings included Renteria's statements to a fellow gang, member Arnulfo Sillas, as we summarized above, in which Renteria said that he gave the gun used in the Deputy Escalante to Stoney Velasquez so that Velasquez

---

[4]    The information also charged Carlos (i.e., "Stoney") Velasquez and Guillermo Hernandez with the premeditated murder of victim Escalante. Neither Velasquez nor Hernandez is involved in the current appeal.

10

could go out and look for, find, and shoot any rival gang member, and in which Renteria explained how he had loaded the weapon. Renteria did not present any defense evidence.

On February 14, 2013, the jury returned verdicts as indicated at the outset of this opinion. The trial court thereafter sentenced Renteria, also as indicated at the outset of this opinion.

Renteria filed a timely notice of appeal.

## DISCUSSION

### I. Severance

Renteria contends that both of his convictions must be reversed because the trial court's decision to deny his motion to sever the two counts charged against him resulted in a violation of his constitutional rights to a fair trial and due process. We disagree.

**The Law**

Section 954 gives the prosecution the discretion to charge "two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts. . . ." (*People v. Jones* (2013) 57 Cal.4th 899, 924, italics omitted (*Jones*); *People v. Elliott* (2012) 53 Cal.4th 535, 552.) Murder and attempted murder are of the "same class of crimes" within the meaning of section 954. (*Jones, supra*, at p. 924.) On the face of the accusatory pleading against Renteria, the two counts charged against him were properly joined.

In evaluating a motion to sever properly joined counts, a trial court may consider several factors, including (1) whether evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) whether certain of the charges may be unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case, or with another weak case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty and joinder thus turns the matter as a whole into a capital case. (*Jones, supra*, 57 Cal.4th at p. 925; *People v. Elliott, supra*, 53 Cal.4th at p. 551.) The decision whether to sever counts that meet the statutory requirements of joinder is vested in the trial court, and its ruling on a severance motion is

11

reviewed for an abuse of discretion, taking into consideration the factors noted above and the facts as they appeared to the court at the time it ruled on the motion to sever. (*Jones, supra*, at p. 925; see also *People v. Homick* (2012) 55 Cal.4th 816, 848.)

This brings us to the law implicated by Renteria's constitutional claim on appeal. Apart from the issue of whether a trial court's denial of a motion to sever constituted an abuse of discretion under state law at the time the court made its decision, a defendant's convictions must be reversed when the ensuing trial of the joined charges, as it actually unfolded, resulted in gross unfairness such that he was denied a fair trial or due process. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1202; *People v. Mendoza* (2000) 24 Cal.4th 130, 162-163; see also *People v. Bean* (1988) 46 Cal.3d 919, 940.)

**The Motion to Sever**

Renteria filed a written motion to sever count one from count three arguing that count one involved the death of a sheriff's deputy and was attracting media and police attention, whereas count three involved a "totally unrelated" incident and would involve "totally different witnesses."[5] The prosecution filed a written opposition to Renteria's motion in which it argued that, as to both counts, gang evidence would provide a context, explain the motive, and support the elements of the crimes and the ancillary gang allegations, including Renteria's mens rea. Further, the prosecution noted that it had called some of the same police witnesses for both counts at Renteria's preliminary hearing, and stated that it anticipated it would do so again for trial. In addition, the prosecution argued that evidence related to both counts was cross-admissible on the issue of intent, and that one crime would not likely inflame the jury as to the other as both involved the same class of crime, and both would involve evidence of gang motive and gang-related allegations. Overall, it was more convenient and efficient to try the two

---

[5] The record on appeal includes a copy of the motion filed in August 2011, and again in December 2012. The motions are materially identical. We are concerned only with a single ruling on the severance issue as it may have subsequently resulted in an impact on the fairness of Renteria's trial as ultimately presented.

counts together. Finally, the prosecution denied that it had joined a strong case with a weak case to help get a conviction on a weaker case.

At the hearing about two weeks before trial, the trial court heard arguments from counsel, then denied the motion to sever. The court found that the evidence related to both counts would be cross-admissible on the issues of motive and intent. Further, that one count was not stronger than the other, and that the case did not involve a death penalty count that was "being bootstrapped because of other crimes."

**Analysis**

Renteria's argument on appeal does not claim the trial court abused its discretion in denying his motion to sever.[6] Accordingly, we do not individually address each of the various factors noted above that are relevant in evaluating a motion to sever. (See *Jones, supra*, 57 Cal.4th at p. 945.)

Renteria contends the trial of the two joined charges against him actually resulted in unfairness under constitutional standards because "[t]he only evidence that was cross-admissible [as to the two counts] was gang membership and gang activities in general." He argues that "the only evidence common to both [counts] was the highly inflammatory testimony of a police gang expert ([LAPD Officer Juan] Aguilar) and a [gang] informant (Francisco 'Pancho' Real) . . . ." Renteria reminds us that courts have recognized that gang evidence has a "highly inflammatory impact" at trial. (Quoting *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905 [evaluating defendant's claim that trial court erred when in overruled his objection to gang evidence under Evidence Code section 352].) Renteria concludes his constitutional argument with the assertion that, with the two counts joined, "there was no way" he was afforded a fair trial as required by the Sixth and Fourteenth Amendments.

---

[6] For the record, we would find no abuse of discretion in the trial court's pretrial ruling to deny severance. On the state of the record before the trial court at the time it made its ruling, its ruling was reasonable, and not an abuse of judicial discretion.

Renteria's arguments on appeal do not persuade us that the trial of the two joined counts against him resulted in an unconstitutionally unfair trial. His argument might give pause for concern had a crime with gang-related aspects been tried with a crime without any gang-related aspects. In such a circumstance, it might be said that the gang evidence as to the gang-related crime may have affected the jury's consideration of the non-gang-related crime. But here, whether the two crimes charged against Renteria were tried to a jury in one trial as occurred, or to two different juries at two separate trials, as Renteria argues should have occurred, the same gang evidence would have been presented in the one or the two trials. In other words, with or without severance, Renteria could not have avoided the potentially damaging impact of gang evidence as to either count, whether tried separately or together. The unfair trial claim raised by Renteria has no connection to the issue of severance, but rather, is a reflection of the nature of the crimes charged and tried against him.

There can be no doubt that had the Escalante murder been tried separately, the evidence of the earlier Piche attempted murder would have been admissible as relevant to show Renteria's gang involvement and intent to benefit his gang. Although it may be a closer call whether, in a separate trial of the Piche attempted murder, the evidence of the later Escalante murder would have been admissible, it likely would have been because the evidence of a later gang crime would, again, be relevant to show Renteria's activities as an Avenues gang member. And, of course, whether there was two separate trials or a joined trial, the broader evidence of the gang history, gang culture, gang motive and gang intent would have been admissible in both trials or either trial.

Renteria's claim that he received an unfair trial is not supported by a showing that the prosecution tried a weak case with a strong case, or tried two weak cases together for an advantage. The evidence showing that Renteria was the actual shooter in the Piche attempted murder was strong. The evidence consisted of Real's testimony, the recorded interview of Andy Castillo, and the testimony of witness Janice Ricardo. The evidence as to the Escalante murder consisted of Pineda's testimony, combined with Renteria's own recorded statements to Sillas and to others. Further, Renteria ignores that the trial court

14

instructed the jury that each count charged a "distinct crime," and that the jury had to decide "each count separately." These instructions mitigated against the risk of any prejudicial spillover. (*People v. Soper* (2009) 45 Cal.4th 759, 784; see also *People v. Mendoza, supra*, 24 Cal.4th at pp. 162-163.)

In summary, Renteria's constitutional claim that he received an unfair trial fails because the gang evidence presented at his single trial would have been admitted in much the same form had he been given two separate trials. A unitary trial merely avoided the necessity of presenting the same evidence twice in two separate trials. (*People v. Soper, supra*, 45 Cal.4th at pp. 781-782.) Having reviewed the trial record in its entirety, we are not persuaded that Renteria's trial was unconstitutionally unfair because the two charges against him were tried together, i.e., because the charges were not severed. Any possible prejudice from the use of gang evidence at trial had no nexus to the issue of severance.

## II.    The Fifth Amendment Claim

Renteria contends his conviction for the premeditated murder of Deputy Escalante as charged in count 1 must be reversed because the trial court wrongly denied his motion to suppress a videotaped conversation that he had with another gang member in a police station interview room. Renteria argues the use of the videotaped conversation violated his Fifth Amendment rights as protected under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We find no error.[7]

### The Procedural and Factual Setting

Before trial, Renteria filed a written motion to suppress evidence of videotaped statements that he made to a fellow gang member, Arnulfo Sillas, in an interview room at the police station. The premise of Renteria's motion was that detectives questioned him in December 2008, after he invoked his *Miranda* rights in November 2008.

---

[7]    Renteria's argument in his opening brief is broadly presented as an overall claim of a violation of his Fifth Amendment rights as protected under *Miranda*. We focus on Renteria's conviction for the premeditated murder of Deputy Escalante as charged in count 3 because the statements which he sought to suppress only involved information related to that crime. Assuming Renteria is contending that both of his convictions must be reversed based on his constitutional claim, our analysis would remain the same.

At an ensuing hearing on the motion, the prosecutor advised the trial court that it was a moot question whether, at any time up to the December 2008 date in question, any police officer had given *Miranda* warnings, or Renteria had invoked his *Miranda* rights, because the prosecution had no intention of using any statements that Renteria made to the detectives in December 2008. The prosecutor explained that, on the December 2008 date in question, the detectives stopped interviewing Renteria, and then brought his friend and fellow Avenues gang member, Sillas, into the interview room, and left them alone to talk. Renteria and Sillas then talked for about an hour; their conversation was videotaped. It was statements made by Renteria while he was talking to Sillas without any police being present that the prosecution intended to use at trial. As the prosecutor explained, there was no *Miranda* issue in that no police officers were present, and, thus, no police officer had asked any questions. As the prosecution stated: "It was literally [a] conversation[] between two fellow Avenue gang members. There, quite frankly, was no interrogation."

After hearing the prosecutor's comments, the trial court asked defense counsel if he still wished to proceed with the motion. Defense counsel said yes, arguing there was an issue whether Renteria's statements to Sillas should be excluded on the ground that Renteria had invoked his *Miranda* rights, and Sillas was "acting as an agent of the police" when talking to Renteria. Defense counsel essentially argued that Sillas was acting in the role of police agent who was interrogating Renteria.

The court set the matter for a hearing, and further briefing was submitted. In an ensuing submission, the prosecutor offered that the People were "*not* seeking admission" (italics in original) of Renteria's statements to detectives during the prosecution's case in chief, and that *Miranda* did not apply to Renteria's statements to Sillas, made while they were alone, because such cellmate or jailhouse conversations fall outside the coercive atmosphere of custodial interrogation implicating *Miranda*'s protecdtions.

16

At the hearing on Renteria's motion, the prosecution called Los Angeles Police Department Detective David Holmes to testify about the circumstances of the events placed at issue by Renteria's motion to suppress. Detective Homes testified he was one of the primary investigators in Deputy Escalante's murder. On December 17, 2008, Renteria was brought from Eastlake Juvenile Hall to the robbery-homicide division by other detectives for a videotaped interview. Those other detectives advised Renteria of his *Miranda* rights and he invoked them. One of the other officers, Detective Grace Garcia, then left the interview room and went looking for Detective Holmes to ask him if he had a videotape of an interview with Carlos Velasquez, another Avenues gang member, in which he admitted shooting someone that turned out to be a deputy sheriff. Detective Holmes retrieved a copy of the videotape and took it to the interview room. When he got to the interview room, Detective Holmes read Renteria his *Miranda* rights, and Renteria agreed to waive his rights.[8] Detective Holmes played the videotape of Velasquez's admission to Renteria, and then began to interview Renteria. At some point, Detective Holmes left the interview room and returned with Sillas, one of Renteria's fellow gang members in the Avenues gang. All of the detectives then left the interview room, and Renteria and Sillas were allowed to stay in the interview room and talk to each other for approximately 55 minutes. Their conversation was videotaped.

Detective Holmes never told Sillas to ask any kind of questions or discuss any particular issues with Renteria. Detective Holmes did not tell Sillas that he would be videotaped. The detectives placed Sillas in the interview room with Renteria with the hopes of getting information from Renteria, to ascertain whether Sillas was an accessory after the fact, and to get evidence against others who might have been involved in Deputy Escalante's murder.

---

[8]    According to Detective Holmes's testimony, he was not aware at the time that Renteria had earlier invoked his *Miranda* rights.

At the conclusion of Holmes's testimony, the prosecution indicated that it would call no other witness. When the trial court inquired whether the defense would be calling any witness, the defense responded that it would not. The court heard argument from the lawyers.[9]

The prosecutor argued it was "clear" that Sillas was not an agent of the police. Moreover, even if Sillas was acting an agent of the police, precedent taught that, unless Renteria knew he was being interrogated by a police agent, *Miranda* did not apply because the coercive nature of police interrogation was absent. As the prosecutor summarized: Renteria was merely "talking to somebody that he perceive[d] as a fellow gang member, a friend, and ma[de] statements voluntarily."

Defense counsel argued that Renteria had invoked his *Miranda* rights, and "from that point on, he shouldn't [have been] questioned about anything." Moreover, the "only purpose" of bringing Sillas into the interview room was to get Renteria to make incriminating statements.

After listening to the arguments, the trial court ruled that Renteria's statements to Sillas were admissible. The court explained that, having read the cases cited by both the prosecution and the defense, it found the fact of whether Renteria invoked his *Miranda* rights or not was "of no moment." The court found, as a matter of fact, that Sillas had no knowledge he was gathering information. The court ruled the defense had not established that Sillas was an agent of the police and that, instead, "[a]ll the evidence" showed that Sillas "was not a police agent at all." The court ruled that, even assuming Renteria had invoked his *Miranda* rights, his statements to Sillas were admissible.

A moment later, plainly anticipating another potential issue, the prosecutor stated that he wanted the record to be clear for purpose of the Sixth Amendment right to counsel that a murder case had not yet been filed against Renteria on the date he was videotaped

---

[9]     As best we can see in the record, the videotaped conversation itself between Renteria and Sillas was neither introduced at the hearing on Renteria's suppression/*Miranda* hearing nor was it played for the trial court to hear nor did the lawyers allude to the content of conversation in any fashion at the pretrial hearing.

18

talking to Sillas. Defense counsel agreed that there had been no murder case filed at that time.

**The Law**

The Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." The published cases teach that "compelled" connotes an element of coerciveness or compulsion at the hands of government officials.

In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court interpreted the Fifth Amendment to require police to adhere to certain practices and to prescribe a sanction for failure to abide the required practices as follows: "[W]hen an individual is taken into custody . . . and is subjected to questioning, the privilege against self-incrimination is jeopardized. . . . [T]o assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Id.* at pp. 478-479, fn. omitted.)

*Miranda* is meant to preserve the Fifth Amendment privilege during interrogation of an individual in a "'police-dominated atmosphere'" because that atmosphere " 'is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " (*Illinois v. Perkins* (1990) 496 U.S. 292, 296 (*Perkins*), quoting *Miranda, supra*, 384 U.S. at pp. 445, 467.) Fidelity to the doctrine and purposes articulated in *Miranda* " 'requires that it be enforced strictly, but only in those types of situations in which the concerns that

19

powered the decision are implicated.' " (*Perkins, supra*, at p. 296, quoting from *Berkemer v. McCarty* (1984) 468 U.S. 420, 437.) When a police-dominated atmosphere and coercion are not present, even though a person is in fact in custody, *Miranda* is not implicated. (*Perkins, supra*, at p. 296 [*Miranda* is not implicated when a person believes he is talking to a fellow inmate, even if fellow inmate is, in fact, an undercover police officer]; see also, e.g., *People v. Davis* (2005) 36 Cal.4th 510, 554 [*Miranda* is not implicated when person speaks to cellmates]; *People v. Mayfield* (1997) 14 Cal.4th 668, 758-759 [*Miranda* is not implicated when person makes statements to a parent]; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 841 [*Miranda* is not implicated when a person makes statements to a cellmate who is also a friend and neighbor].) In short, *Miranda* is not implicated when a person speaks to someone else with " 'misplaced trust.' " (*People v. Gonzales* (2011) 52 Cal.4th 254, 284.) *Miranda* is implicated only when a person talks in a police-dominated, coercive situation.

In ruling on a defendant's motion to suppress statements as made in violation of *Miranda*, the trial court must find the historical facts, and then apply the law to the facts to determine whether *Miranda* was violated. (*People v. Gonzales, supra*, 52 Cal.4th at p. 284.) An appellate court reviews the trial court's resolution of historical facts under the substantial evidence standard of review, while selection and application of the law to the facts as fixed is subject to independent review. (*Ibid.*)

**Analysis**

The trial court correctly ruled that Renteria's videotaped statements to Sillas were admissible because the evidence established that Renteria did not make his statements in the context of a custodial interrogation. On the contrary, the evidence established that Renteria was talking to somebody whom he perceived to be a fellow gang member and a friend. *Miranda* is not implicated when a person talks in such a situation.

20

Renteria argues that the police deliberately placed Sillas in the interview room in the hope that Renteria would make incriminating statements. We are willing to assume these are the true facts, but this does not affect the *Miranda* issue.[10] *Miranda* is designed to protect a person's Fifth Amendment privilege by protecting him or her from feeling coerced or compulsed by police words or conduct into making a statement. When, as in Renteria's current case, a person speaks to someone whom the person does not perceive to be a police official, even if under a misplaced trust, there is no *Miranda* implication. "Viewing the situation from [Renteria's] perspective, . . . when he made those statements to his cellmates there was no longer a coercive, police-dominated atmosphere and no official compulsion for him to speak." (*People v. Davis, supra,* 36 Cal.4th at p. 555.)

Renteria's focus on what constitutes police "interrogation" is misdirected. The issue in Renteria's case is not whether the police "interrogated" him within the meaning of *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*),[11] but whether Renteria felt he was in a police-dominated atmosphere which may have coerced him to talk. In short, we need not reach the issue of whether the actions of the police directed toward Renteria in the interview room amounted to interrogation because the predicate environment required for application of *Miranda*'s protections was absent.

---

[10] Renteria's case does not involve the Sixth Amendment right to counsel that is protected by a rule precluding the police from talking to a defendant after charges have been filed and counsel has been appointed to represent the defendant. (See generally *Massiah v. United States* (1964) 377 U.S. 201.)

[11] In *Innis*, the United States Supreme Court explained that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards *were designed to vest a suspect in custody with an added measure of protection against coercive police practices*, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to [an] interrogation." (*Innis, supra,* 446 U.S. at pp. 301-302, fns. omitted, italics added.)

Renteria argues that several other factors, whether apart from or joined with the actual police interrogation in the interview room, support a conclusion that he felt he was in an atmosphere coercive to making a statement. Renteria points to the facts that he was handcuffed during the conversation with Sillas, that he thought the police might be recording them, and that Detective Holmes had made comments before leaving the interview room indicating that the police wanted Renteria to ask Sillas where he had put the gun used in the Escalante murder. As Renteria argues in his opening brief on appeal, he "suspected [at the time] that something was amiss in their being brought together."

We reject Renteria's argument for two reasons. First and foremost, the facts that Renteria cites are supported by references to his videotaped conversation with Sillas, and, as noted above (see footnote 5, *ante*), the videotaped conversation itself was not involved in any meaningful fashion at the suppression/*Miranda* hearing in the trial court. Renteria is essentially attempting for the first time on appeal to bring in evidence and raise issues in support of his suppression/*Miranda* claim. We decline to accept Renteria's showing on appeal. Unless a defendant asserts a specific ground in the trial court for suppression of his statements under *Miranda*, the ground is forfeited on appeal, even though in the broader sense the *Miranda* decision was raised in the trial court. (See *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194; see also *People v. Ray* (1996) 13 Cal.4th 313, 339.)

But even assuming the facts shown by the videotaped conversation are properly before us on appeal for purposes of evaluating Renteria's *Miranda* claim, we disagree with him that those facts support the conclusion that he felt he was in a police-dominated, coercive environment when he was talking to Sillas. We do not see how Renteria's being handcuffed would have made him feel coerced into talking to Sillas. Further, we do not see how Renteria's concern that his conversation with Sillas was being recorded would have made Renteria feel coerced into talking to Sillas. And we have the same view as to Detective Holmes's statements to Renteria before the detective and the other officers left the interview room. The bottom line is that in our review of the videotaped conversation between Renteria and Sillas in its entirety it shows that they spoke to each other freely and candidly for nearly an hour because they voluntarily wanted to speak, not because

22

they felt coerced to speak to each other. The entire tenor of the conversation is natural and free-flowing insofar as a conversation between two gang members goes. Renteria and Sillas talked about subjects unrelated to Escalante's murder, including some of their common acquaintances, parents, moving to a new city, school, grades, girls, and sex. The fact that their conversation also included references to gang members, gang activities and the Escalante murder does not show the either of the two felt coerced to speak to the other.

In the end, keeping in mind that the focus is on the individual's perspective of coercion or compulsion, not on the intent of the police, we are satisfied that the trial court properly denied Renteria's suppression/*Miranda* motion. Renteria may have been foolish or under misplaced trust when he spoke to Sillas, but the record does not support the conclusion that he felt coerced by any police action or words to speak.

## III.   The Confrontation Claim

Renteria contends his conviction for the attempted premeditated murder of Luis Piche as charged in count 3 must be reversed because the trial court erred in ruling that the prosecution would be allowed to introduce Piche's preliminary hearing testimony to the jury. Renteria argues the court erred in ruling that the prosecution had exercised due diligence in attempting to bring Piche to court to testify at trial, and, consequently, that the use of Piche's preliminary hearing testimony violated his confrontation rights under the federal and state constitutions, as well as the Evidence Code. We find no error.

### The Law

The Sixth Amendment's Confrontation Clause (applicable in state prosecutions by the 14th Amendment of the United States Constitution), and the California Constitution's confrontation clause, guarantee a criminal defendant the right to confront, i.e., to cross-examine, the prosecution's witnesses. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).) The constitutional right to confront the prosecution's witnesses, whether grounded in federal or state constitutional provision, does not impose an absolute requirement that a witness testify at trial against a defendant; an exception to confrontation in the courtroom is allowed when

23

a witness is "unavailable" at the time of trial as defined under constitutional precepts, but gave prior testimony at a previous judicial proceeding against the defendant at which the witness was subject to cross-examination. (*Herrera,* at p. 621.) In short, a witness's preliminary hearing testimony may be admitted against a defendant at the time of trial without violating his or her constitutional right of confrontation when the witness is unavailable at the time of trial as defined under constitutional precepts. (*Ibid.*)

The published cases define "unavailable" for constitutional purposes and analysis to include elements of good faith and due diligence on the part of the prosecution to procure the witness's attendance at trial. As the Supreme Court stated in *Ohio v. Roberts* (1980) 448 U.S. 56, the Sixth Amendment "does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists . . . , 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." (*Ohio v. Roberts,* at pp. 74-75, abrogated on another ground in *Crawford v. Washington* (2004) 541 U.S. 36.)

As a matter of statutory law, prior testimony is hearsay when it is offered for the truth of the matter asserted, and, where such is the situation, is inadmissible except as provided by the hearsay statutes. (Evid. Code, § 1200.) Under section 1291, hearsay in the form of a witness's prior testimony is not made inadmissible by the hearsay rule and may be admitted at a hearing if the hearsay declarant is "unavailable," and the party against whom the prior testimony is offered " 'had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' " (*People v. Cromer* (2001) 24 Cal.4th 889 (*Cromer*).) Section 240, subdivision (a)(5), defines a witness as unavailable when he or she is absent from the hearing, and the proponent of his or her testimony has exercised reasonable diligence but

24

has been unable to procure his or her attendance by the court's process. In *Cromer,* our state Supreme Court stated that these Evidence Code sections codify the exception to the right of confrontation guaranteed by the Sixth Amendment. (*Cromer, supra*, at p. 898.)

We understand from *Cromer, supra*, 24 Cal.4th 889, that the standard of review for a trial court's determination of admissibility vis-à-vis the issues of "unavailability" and "reasonable diligence" is similar under Sixth Amendment's right of confrontation as it is under the Evidence Code. The standard of review has two components. First, we determine the historical facts, which is a review of the prosecution's efforts to locate the witness. Where the historical facts are in dispute, we apply a deferential substantial evidence standard. (*Cromer, supra*, at p. 894.) As to the ultimate legal issue of whether those historical facts support a finding of reasonable diligence, we apply the de novo or independent standard of review. (*Id*. at pp. 893-894; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 675; and *People v. Bunyard* (2009) 45 Cal.4th 836, 855.)

**The Factual and Procedural Setting**

On December 10, 2012, the trial court set trial to begin on Monday, February 4, 2013. On Friday, February 1, 2013, one of the prosecutors advised the court that the prosecution had not been able to subpoena Piche for trial. According to the prosecutor, "[s]ignificant effort" had been made to serve Piche for trial, but those efforts had been "unsuccessful." The prosecutor anticipated that, "at some point," a due diligence hearing would be conducted at which the prosecution would need to establish that it had made the "necessary efforts" to find and serve Piche. The prosecutor explained that Piche's girl-friend, Samantha Alfaro, was present in the court, and requested that her testimony be taken to be used in connection with any later due diligence hearing. Renteria's defense counsel stated that the defense had no objection, "for the limited purpose of her to testify . . . as to what she knows." Ms. Alfaro's testimony is discussed in more detail below. Later, during trial, the prosecution apparently made a "motion" to present Piche's preliminary hearing testimony, and the defense apparently objected.[12]

---

[12]    The trial court referred to a "motion," and conducted a "due diligence hearing."

25

On February 8, 2013, in the middle of trial, the court conducted a "due diligence hearing to determine if the witness [was] unavailable within the meaning of Evidence Code section 240." During that hearing, prosecutor Phillip Stirling and LAPD Detective Carlos Camacho testified. Their testimony is discussed in more detail below.

At the conclusion of the testimony, prosecutor Stirling argued that the issue of due diligence was discussed in a number of published cases including *People v. Bunyard, supra,* 45 Cal.4th 836, and that cases taught that the requirements for due diligence did not require "hindsight, 20/20, what could have been done," but whether what had been done was reasonable. When the court inquired of Renteria's counsel whether he had anything to argue, counsel replied, "Submit."

The trial court noted that due diligence had been found in the published cases when the prosecution's efforts are "timely, extensive, and carried out over a reasonable period." The court found that Piche had been "adamant," and had told others, including Alfaro, that he was "not going to be found." Based on this foundation, the court ruled that Piche was "unavailable within the meaning of Evidence Code section 240." When the court inquired whether there was "any issue to discuss by any counsel" with regard to section 1291, prosecutor Stirling replied that he "didn't believe so," and there was no reply from Renteria's counsel.

**Analysis**

Preliminarily, we construe the record summarized above to show that Renteria preserved a claim for statutory-based error under the Evidence Code, and also a claim for constitutional error under the confrontation clauses of the federal and state constitutions. We reject Renteria's claim that his right of confrontation, both under the constitutional provisions and under statutory hearsay rules, was violated by the trial court's ruling to allow the prosecution to introduce Piche's preliminary hearing testimony at trial.

The showing in the record supports the conclusion that the prosecution exercised reasonable diligence in attempting to locate and secure Piche's attendance at trial. The evidence showed that, after the preliminary hearing in May 2010, one of the prosecutors periodically called Samantha Alfaro, Piche's girlfriend, and spoke to Alfaro and Piche.

26

At some point in 2012, Alfaro got a new telephone number, and the prosecutor was no longer able to contact her or Piche telephonically.

On December 10, 2012, the trial court set trial to begin on February 4, 2013. On January 1, 2013, the lead investigators, LAPD Detective Carlos Camacho and LAPD Detective Howard Jackson, went to Piche's residence. As the detectives were walking to the partially open front door, a lot of dogs started barking, and someone shut the door before the detectives could reach it. Piche's mother eventually answered the door in response to the detectives' knocks and said that Piche was heavily medicated and could not speak with them. The detectives returned to the residence on January 29, 2013, and no one responded to the door. On January 30, 2013, Piche's mother refused to let them enter the residence. The detectives went to the residence again on January 31, 2013, and Piche's mother said that he was getting treatment at a local hospital. The detectives served Piche's mother with a subpoena when she refused to let them enter the apartment. The detectives then went to the hospital, but were unable to locate Piche. They returned to Piche's residence. The owner of the apartment gave the detectives access to Piche's unit, but Piche was not there. The detectives returned to Piche's residence on February 1, 2013, before going to two other locations where Piche could be located. After calling entities listed on a "due diligence checklist" and visiting hotels serving people with "marginal incomes," the detectives returned to Piche's residence on February 7, 2013, but no one answered the door.

We reject Renteria's contention that that the prosecution's efforts must be deemed "not diligent" as a matter of law because there was an unreasonable gap between the first visit to Piche's residence on January 1, 2013, and the next visit on January 29, 2013. An assessment of due diligence must be based on the overall efforts of the government, and we do not read any of the cases cited by Renteria to support the proposition that a particular gap in efforts necessarily defeats a finding of due diligence.

In Renteria's current case, witness and victim Piche (mostly through his girlfriend, Alfaro) remained in contact with the prosecution from the time of Renteria's preliminary hearing in May 2010 through 2012. Then, Alfaro changed her telephone number at

27

some point in 2012. Piche's mother refused to allow the detectives to talk to Piche when they went to his home on January 1, 2013. Where a witness appears to authorities to be hiding as a trial approaches, as Piche plainly was, it is not unreasonable to wait until closer to the date of trial to attempt to serve the witness. (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 707 [finding support in record for conclusion that serving a subpoena on an unwilling witness too far in advance of trial would have ensured she would be unavailable for trial].)

Renteria next argues it was unreasonable for authorities not to return to Piche's residence at any point between January 1, 2013 and January 29, 2013, with Renteria's trial set to begin on February 4, 2013. In our view, the gap, although relevant, is not disputable. Rather, the proper focus of examination are the efforts of authorities in the days leading up to trial. In other words, it is whether the detectives' sustained and repeated efforts to locate Piche in least six days prior to trial, were reasonable or unreasonable. The fact that authorities do not undertake efforts to find and serve a witness until the final week before trial does not necessarily mean that due diligence cannot be found, as a matter of law. For example, in *People v. Smith* (1971) 22 Cal.App.3d 25, the Court of Appeal upheld a finding of diligence where the search for witness began a week before trial. (*Id*. at pp. 31-32.) The result was the same in *People v. Rodriguez* (1971) 18 Cal.App.3d 793, in which the Court of Appeal upheld a finding of diligence where an investigator began attempting to locate a witness six days before trial. The diligence test is not tied to a specific number of days before trial, but to the factual issue of whether efforts undertaken were reasonable.

Renteria argues the detectives' efforts to find and serve Piche in his case were not reasonable because they "would have been able to serve" Piche successfully if they had returned to Piche's residence "a day or two" after the detectives were told by his mother that "he was too medicated to speak with them." We are not persuaded that a finding of unreasonableness was demanded. Apart from the fact that Renteria's assertion that the detectives "would have been able" to effect service is speculative, the testimony by his girlfriend, Alfaro, and by the prosecutor, Stirling, support the conclusion that Piche was

actively avoiding service because he did not want to testify during the trial. In looking at what reasonably could have been done, and what would have been successful, the trial court was permitted to consider the actions of the person whom the detectives were trying to find and serve.

Alfaro acknowledged that, on at least one occasion when police came to the door of Piche's residence, Piche was home, but refused to answer the door. Alfaro admitted that she told the prosecutor on January 31, 2013, that Piche was going to "take off" and "'be out of here'" and was unwilling to come to court. Piche's own telephone calls to prosecutor Stirling further showed that Piche had become unwilling to testify at trial and was purposely avoiding the detectives. Piche told Stirling that he (i.e., Piche) "extremely displeased" with the efforts to locate him, and explicitly stated, "I'm not coming to court."

Given that Piche was hiding to avoid being served with a subpoena, it could be found that additional steps by the prosecution would not have resulted in successfully locating and serving Piche for trial, and, thus, that it was not unreasonable to have forgone such additional efforts. "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence . . . but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." (*Hardy v. Cross* (2011) __ U.S. __ [132 S. Ct. 490, 495]; see also *People v. Fuiava, supra*, 53 Cal.4th at p. 676; and *People v. Wilson* (2005) 36 Cal.4th 309, 342.)

In the final analysis, we are satisfied that the totality of the circumstances support the conclusion that the prosecution used reasonable efforts to locate Piche, that is, that it exercised due diligence. (*People v. Fuiava, supra*, 53 Cal.4th at p. 677.) Therefore, the trial court did not err in allowing Piche's preliminary hearing testimony to be read to the jury.

29

**Constitutional Harmless Error Analysis**

Assuming, in contradiction to our conclusion above, that the trial court erred in admitting Piche's preliminary hearing testimony at Renteria's trial, we would find the confrontation error to have been harmless under the constitutional standard of beyond a reasonable doubt. (*People v. Louis* (1986) 42 Cal.3d 969, 993; *Chapman v. California* (1967) 386 U.S. 18, 24.) The testimony that Piche gave at the preliminary hearing, and which was later used at Renteria's trial, was not of vital importance to the prosecution's case at trial. Piche's testimony at the preliminary hearing largely set the framework of the shooting, but he did so without identifying the shooter. The case against Renteria at the time of trial — and specifically as to his identity as the shooter, was established by evidence from witnesses, Francisco "Pancho" Real, Andy Castillo, and Janice Ricardo. Witness Real expressly testified that he saw Renteria shot Piche, as did witness Ricardo. And this was verified by the out-of-court statement of Castillo, who said that he saw Renteria, known to him as Snapper, get into the shooter's vehicle while carrying a "big" gun that was approximately two and a half feet long. We have no doubt that the use of Piche's preliminary hearing testimony did not contribute to jury's guilty verdict against Renteria for the attempted murder of Piche, and that the verdict would have been the same without Piche's preliminary hearing testimony. Thus, that its use was harmless beyond a reasonable doubt.

Renteria is simply incorrect that the examination of Piche at the preliminary hearing was insufficiently developed because no lawyer asked Piche whether it had been Real or Castillo who shot him. During the preliminary hearing, Piche was asked if he recognized the shooter in court. Piche appeared to be staring at someone in court, but stated, "I have a loss for words." When asked again if he recognized anyone in court, Piche responded, "Like I said, it happened fast." Piche admitted that he was looking at someone in the courtroom and that his jaw was trembling and shaking. Piche also described himself as being angry. When asked if he was angry because he saw the person who shot him, he replied, "Yeah, I am." It is clear from Piche's testimony that Piche would not have testified that Real or Castillo shot him since there is no evidence

that either of them was in the courtroom at that time during the preliminary hearing. (The reporter's transcript from the preliminary hearing shows that there was an order for the exclusion of witnesses at the beginning of the proceeding.) Equally important, there is nothing in the record to show that Renteria's counsel at the preliminary hearing did not have the *opportunity* to cross-examine Piche about the identity of the shooter.

For all of the reason discussed above, Renteria's conviction for the attempted premeditated murder of Piche cannot be reversed for confrontation error associated with the use of Piche's preliminary hearing testimony at the time of Renteria's trial.

## IV. The Motion to Recuse the Prosecutors

Renteria contends his convictions must be reversed because the trial court abused its discretion in denying his oral motion on the eve of trial to recuse the prosecutors. We find no error.

### The Trial Setting

Renteria's case was called for trial on Monday, February 4, 2013. About a week before trial, the trial court received a sheriff's incident report concerning a matter that had occurred in the court's lock-up area on January 25th. According to the report, when Renteria was unshackled, he "attacked Deputy District Attorney Colello [a prosecutor in Renteria's case], hitting him approximately three times in the facial area." At a hearing on Friday, February 1, 2013, the court conducted a hearing to determine whether Renteria would be shackled during trial. During the hearing, prosecutor Colello described the injuries inflicted by Renteria, including a cut lip and swelling. The trial court ruled there was a manifest need to shackle Renteria during trial, and ordered that he was to be placed in "full waist-chains and strapped to the chair."

Moments after the trial court issued its shackling order, Renteria's trial counsel made an oral motion — "based on the incident that the court use[d] as a basis for [its order] — to recuse the District Attorney's Office of Los Angeles in its entirety. The court's initial response was that the defense did not comply with section 1424, which required notice to be given to the Attorney General, and that, as result, it was not going to entertain the motion. Renteria's counsel then made an oral motion to recuse the two

31

prosecutors who were handling the case. Though the court stated it believed the motion still fell within section 1424, the court agreed to hear arguments. Defense counsel argued that the two prosecutors should be recused because they were potential witnesses and victims in a future assault filing. Defense counsel asserted that the prosecutors' impartiality had been "greatly affected."

In response, prosecutor Colello argued that the incident had occurred a full week earlier, and that defense counsel knew about the incident the same day. The implicit suggestion was that the recusal motion was an untimely attempt to delay trial. Further, recusal was only appropriate when a defendant presented "competent evidence" that he could not receive a fair trial, and Renteria had presented "absolutely no evidence of that." The prosecutors in Renteria's case acted only as they would in any other case and had not treated Renteria any differently than any other defendant. Renteria had not offered any evidence that he was being treated unfairly by the prosecutor's office or by either of the prosecutors. In addition, prosecutor Colello argued there was no evidence that an assault or battery case would be filed against Renteria, and represented that it was "highly unlikely" there would be. And, the prosecution did not plan to introduce any evidence that Renteria had attacked one of the prosecutors.

After listening to the arguments, the trial court denied Renteria's motion to recuse on the ground the defense had not shown a "genuine conflict that would result in the defendant not receiving a fair trial."

**The Governing Law**

Under Penal Code section 1424, a court may not grant a defendant's motion to recuse a prosecutor unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 727.) The statute articulates a two-part test: (1) is there a conflict of interest?; and (2) is

32

the conflict so severe as to disqualify the district attorney from acting? (*Haraguchi,* at p. 711; *Hollywood,* at pp. 727-728.)[13]

Under the first part of the test, a court must determine whether a conflict in fact exists, that is, whether the circumstances of a case evidence a reasonable possibility that the prosecutor's office may not exercise its discretionary function in an evenhanded manner. (*Haraguchi v. Superior Court, supra*, 43 Cal.4th at p. 713.) If such a conflict does exist, the court must then determine whether that conflict is so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings. (*Ibid.*)

A recusal motion is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed for an abuse of discretion. (*Haraguchi v. Superior Court, supra*, 43 Cal.4th at p. 711; *Hollywood v. Superior Court, supra*, 43 Cal.4th at p. 728.) In reviewing a ruling on a recusal motion, the trial court's findings of historical facts are reviewed for substantial evidence; its conclusions of law are reviewed de novo. (*Haraguchi,* at pp. 711-712.) A reviewing court reviews recusal motions for an abuse of discretion "precisely because trial courts are in a better position than appellate courts to assess witness credibility, make findings of fact, and evaluate the consequences of a potential conflict in light of the entirety of the case . . . ." (*Id.* at p. 713; see also *Spaccia, supra,* 209 Cal.App.4th at p. 107.)

**Analysis**

The trial court did not abuse its discretion in denying Renteria's recusal motion. We see no evidence in the record to support a conclusion that there was a reasonable possibility the prosecutors might not exercise their duties in an evenhanded manner. The prosecutor represented that Renteria had not been treated differently than any other defendant, and the trial court, of course, observed the proceedings, and was in a position assess the prosecutor's representation. Further, the prosecutor represented that it was

---

[13] Section 1424 applies equally to recusal of an individual district attorney as it does to recusal of the entire district attorney's office. (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 104 (*Spaccia*).)

"highly unlikely" that assault charges would be filed against Renteria based on the incident in the courthouse, and that no evidence of the incident would be presented during the trial.

Renteria did not dispute the prosecutors' representations that they had treated him respectfully, and that they had not treated him unfairly or any differently than any other defendant in any other criminal case. Neither Renteria nor his trial counsel proffered any incident tending to show unfairness. For all of these reasons, Renteria has not demonstrated on appeal that the trial court abused its discretion

We reject Renteria's argument that the absence of evidence tending to show actual unfairness is not dispositive of the recusal issue because there was an "appearance" of a conflict between him and the prosecutors. He cites *People v. Conner* (1983) 34 Cal.3d 141 (*Conner*) in this vein. We are not persuaded for several reasons.

First, recusal is not permissible merely because the district attorney's further participation in the prosecution would *appear* improper. (*Spaccia, supra*, 209 Cal.App.4th at pp. 105-107; see also *People v. Vasquez* (2006) 39 Cal.4th 47, 69 [section 1424 "was enacted in part to tighten the standards for recusal so that a mere appearance of impropriety would not itself suffice"].) In short, recusal is justified only when the potential for prejudice to the defendant "is itself real." (*Spaccia,* at p. 107.)

*Conner* does not teach differently. In *Conner*, the defense moved to recuse the entire office prosecuting his case after an incident occurred in the courthouse in which the defendant shot at the prosecutor who was handling his case. (*Conner, supra*, 34 Cal.3d at pp. 144-145.) Based on the incident, the defendant was charged with additional crimes, and the defendant's cases were transferred to another prosecutor in the same office. (*Id.* at p. 145.) The Supreme Court upheld the trial court's granting of the motion to recuse the entire prosecutor's office because the prosecutor/victim had been exposed to a "harrowing experience" and was "a witness to, and a potential victim of, defendant's alleged criminal conduct" and the prosecutor had communicated his experience to a "substantial number" of the 25 attorneys in the felony division of his office, as well as the media. (*Id.* at pp. 148-149.) As a consequence, there was substantial evidence to support

34

the trial court's conclusion that there was a conflict of interest that made it unlikely the defendant would receive a fair trial. (*Ibid.*) Because *Conner* involved the recusal of an entire prosecutorial agency and was based, in part, on the size of that office, it is inapplicable to this case.

*Millsap v. Superior Court* (1999) 70 Cal.App.4th 196 (*Millsap*) offers better guidance for Renteria's case. In *Millsap*, the defendant was charged with 27 felony counts; two of the counts alleged that the defendant solicited the murder of the two prosecutors who were handling the case. (*Millsap,* at p. 198.) The Court of Appeal found that "a real potential for actual prejudice" would be established if the prosecutors whose murders he solicited were to prosecute him for the solicitation of murder counts. (*Id.* at pp. 203-204.) However, such prejudice could be avoided if the solicitation counts were severed from the rest of the charges, and tried by other prosecutors in the office. (*Id.* at p. 204.) The Court of Appeal ruled that the two prosecutors who were the targets of the solicitation counts were not precluded from trying the nonsolicitation counts because there was no reason that either prosecutor would testify as a witness in those non-solicitation charges, there was "no apparent reason for the jury that tries those counts to learn of the solicitation counts," and there was no reason that "prosecutorial discretion" on the nonsolicitation charges "would be compromised" so that the defendant "would not receive a fair trial." (*Ibid.*) In so ruling, the Court of Appeal noted the obvious — that "were it possible for a defendant charged with serious crimes to disqualify the prosecutors trying the case from proceeding with the prosecution by threatening them, willful defendants would be handed a powerful weapon to disrupt the course of justice." (*Ibid.*)

We find the same reasoning applies in Renteria's case. The trial court properly denied giving Renteria the power to disqualify a prosecutor by his own act of attacking the prosecutor.

Finally, assuming the trial court erred in denying recusal, we will not reverse because Renteria has failed to show prejudice from the trial by the prosecutor whom he (Renteria) attacked. Renteria fails to point any trial event which would tend to support a

35

conclusion that the prosecutor acted improperly against Renteria at any time, or that the jurors ever knew of the attack on the prosecutor. The prosecutor did not testify against Renteria at trial. In short, Renteria fails to show any prejudice or even a potential for prejudice in the outcome of his trial due to the failure to recuse the prosecutor.

## V.     Sentencing — Life Without the Possibility of Parole

Renteria contends his sentence of life without the possibility of parole on his first degree, special circumstances, murder conviction must be vacated because it constitutes cruel and/or unusual punishment in violation of federal and state constitutional law prohibiting such punishment. Renteria's argument is based on the fact that he was only a juvenile when he committed the first degree special circumstance murder. We find no constitutional basis for vacating Renteria's sentence of life without the possibility of parole on his first degree, special circumstances, murder conviction.

### The Sentencing and Legal Setting

Renteria shot and attempted to murder victim Piche on May 15, 2007. Renteria was 16 years old on that date. Renteria shot and murdered victim Escalante on August 2, 2008. Renteria was 17 years old on that date. The jury convicted Renteria in February 2013, and the trial court sentenced Renteria in March 2013,

Meanwhile, in June 2012, months before Renteria was sentenced, the United States Supreme Court decided *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455] (*Miller*). In *Miller*, the United States Supreme Court ruled that a state sentencing law which imposes a mandatory sentence of life without the possibility of parole as to all defendants violates the Eighth Amendment's prohibition on cruel and unusual punishment when such a law is applied to a defendant who was a juvenile at the time he perpetrated his commitment offense.

In August 2012, again before Renteria was sentenced, our state Supreme Court decided *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). In *Caballero*, our state Supreme Court ruled that sentencing a juvenile offender for a nonhomicide offense to a specified term of years, with a parole eligibility date that falls outside the offender's own natural life expectancy, constitutes cruel and/or unusual punishment under both the

36

federal constitution and state constitution. (*Caballero*, at pp. 268- 270, discussing *Miller, supra*, 132 S.Ct. 2455 and *Graham v. Florida* (2010) 560 U.S. 48 [sentence of life in prison without the possibility of parole for a nonhomicide offense violates the Eighth Amendment].) Our state Supreme Court vacated the defendant's sentence and remanded for resentencing in light of these principles.

**Analysis**

Article I, section 17 of the California Constitution prohibits cruel or unusual punishment. In *In re Lynch* (1972) 8 Cal.3d 410, our Supreme Court held a punishment may violate the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id*. at p. 424, fn. omitted.) Under *Lynch*, there are three separate prongs of analysis: (1) the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; (2) a comparison of the challenged penalty with punishments prescribed in the same jurisdiction for different, more serious offenses; and (3) a comparison of the challenged penalty with punishments prescribed for the same offense in other jurisdictions. (*Id*. at pp. 425-427.)

The federal constitutional standard is similar to the state constitutional standard. The Eighth Amendment to the United States Constitution, applicable to the states by the Fourteenth Amendment, prohibits cruel and unusual punishment. Under the federal constitutional examination, a sentence is cruel and unusual when it is disproportionate to the defendant's crime. (See, e.g., *Solem v. Helm* (1983) 463 U.S. 277; *Harmelin v. Michigan* (1991) 501 U.S. 957.) In determining whether crime and sentence are unconstitutionally disproportionate, courts are required to evaluate certain objective criteria including the seriousness of the offense, the penalty imposed, the sentences imposed on others who have committed the same or similar offenses in the same jurisdiction, and the sentences imposed in other jurisdictions for the same or similar offenses. (*Solem*, at p. 292.)

As discussed above, issues concerning juvenile offenders and lengthy sentences have been the subject of a number of recent state and federal court decisions. (See, e.g., *Graham, supra*, 560 U.S. 48; *Miller, supra,* 132 S.Ct. 2455; *Caballero, supra,* 55 Cal.4th 262.) No case has definitively ruled that a sentence of life without the possibility may not be imposed upon a defendant who was a juvenile at the time he perpetrated his commitment offense.

In Renteria's current case, we consider the constitutionality of a sentence of life without the possibility of parole on a defendant who was 17 years old on the day of his crime. He was convicted of first degree murder, with a special circumstance finding. While *Caballero* did not involve a juvenile who had been convicted of murder, our Supreme Court there did discuss the possibility of a murder sentence violating the Eighth Amendment as follows: "Although *Miller* concluded that *Graham*'s categorical ban on life without parole sentences applies only to all nonhomicide offenses, the court emphasized that in homicide cases, states are forbidden from imposing a " '[m]andatory life without parole for a juvenile.' " (*Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.) Our Supreme Court noted that mandatory sentences preclude consideration of a juvenile's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. Such sentences also prevent taking into account the family and home environment that surround the juvenile—no matter how brutal or dysfunctional. Our Supreme Court concluded: "Thus, in *Miller* the high court did 'not foreclose a sentencer's ability' to determine whether it was dealing with homicide cases and the ' "rare juvenile offender whose crime reflects irreparable corruption." ' [Citations.] The court requires sentencers in homicide cases 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.] We leave *Miller*'s application in the homicide context to a case that poses the issue." (*Caballero*, at p. 268, fn. 4.)

38

On May 7, 2014, well after briefing in Renteria's current appeal, our state Supreme Court issued an opinion establishing new guidelines for sentencing of a juvenile in a case involving a punishment of life without the possibility of parole. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).) In *Gutierrez*, the Supreme Court ruled that a sentencing court may not start with a *presumption* that a sentence of life without the possibility of parole is the appropriate sentence for a juvenile offender in a special circumstances case. Here, the trial court expressly stated at the time of sentencing that it was *not applying any presumption* in favor of a sentence of life without the possibility of parole. Rather, the court found such a sentence to be appropriate as a pure matter of the court's discretion, taking into account all of the facts and circumstances surrounding Renteria's crimes and background. Accordingly, we find no violation of *Miller*.

We find no error in the trial court's decision that the punishment imposed on Renteria is appropriate in light of all of the circumstances, notwithstanding his age of the day he committed his crimes. Renteria participated in what may fairly be called the hunting for and killing of a defenseless victim. The murder of Deputy Escalante was an execution-style killing for the fun of the kill. Renteria's punishment fit his offense. Until such time as a higher court rules that a sentence of life without the possibility of parole may never, under any circumstances, be imposed on a juvenile, we will not find constitutional error in a case such as Renteria's current case.

## DISPOSITION

The judgment is affirmed.


                                                          BIGELOW, P.J.

We concur:



        RUBIN, J.                    FLIER, J.


39